[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a complaint in four counts brought by Garfield Coleman against Johnson Grandahl, Inc. Count one alleges breach of an agreement; Count two, misrepresentation; Count three violation of C.G.S. § 14-65e et seq.; Count four violation of C.G.S. § 42-110b, et seq. (CUTPA)
The facts are as follows: The plaintiff, Garfield Coleman, picked up a 1981 Camaro Chevrolet Limited in September 1996. In November 1996 the car hit a pole causing damage to the front nose of the car. The plaintiff had the car towed to the defendant garage, Johnson and Grandahl, Inc. (J 
G), where a friend of the plaintiff's, one Joe Bailey, worked. The plaintiff talked to the owner of the garage, Robert Grandahl, about repairing the damaged front end of the car. Grandahl told Coleman he could repair it; that he would have to look around for replacement parts; and that he could not give him an estimate because he could not tell at that point where to get the parts needed. Grandahl made it clear that he would not promise when the work would be completed. The work would be on a time and material basis. Coleman agreed to that. It was agreed they would start with the plaintiff giving Grandahl $1,500 toward parts and that as more parts were found additional cash would be advanced by Coleman.
At this first meeting, Grandahl told Coleman that he would. work on the car off and on as he could, that he did a lot of insurance work which was time specific. Coleman assured Grandahl that that would not be a problem.
Within the first four to six weeks Grandahl and Coleman talked further about the collision work. Parts were priced at $3,500 and labor at $3,500. There was no discussion about a payment schedule. $1,500 had already been paid up front.
Over time between January and February 1997 as parts were located some work was done on the car. Plaintiff, was out on disability leave at the time and would regularly drop by to see what was going on. On occasion he would bring coffee. Coleman got to be on very friendly terms with the small work crew which included Joe Bailey, Kozikowski and Grandahl. Kozikowski did the heavy collision work and Grandahl did the light collision and restoration work. Kozikowski and Coleman became close friends. Their families socialized together. Kozikowski himself put in work after hours on the Coleman car for which he did not log in pay time. CT Page 11032
Coleman told Grandahl and Kozikowski that he was going to race the car. His plan was to replace the car's present motor with a larger one and to that end Coleman picked up a radiator larger than the one in the car. Since a new motor was to go in, the oversized radiator was put in place and secured with sturdy metal form coat hangers. Fine alignment of the hood and other parts of the car would follow once the new motor was in place and the radiator re-inserted and secured.
At the outset there was an agreement to disassemble the car to see the parts needed. The nose was found at Webster Auto. The parts found were often better than the parts being replaced. But, even these had to be refinished as they came in. The fenders of the car, both left and right, had to be stripped and repainted because they had body rot. Good records were kept of parts ordered and received. Coleman was privy to all of this, being almost a daily visitor. Coleman was also kept informed of any mechanical problems that came to light in the course of J G's work. Coleman was told there were problems with the car's front end suspension. Coleman knew this and said he planned to replace it in order to support the new engine.
In keeping with his expressed plan to race the car Coleman bought subframe connectors which he had J G put on the car. The instructions that came with the connectors said bolt on. Coleman told Kozikowski to weld them on.
While the front end body work was still going on, Coleman decided he wanted to change the color and asked Grandahl about repainting the car. Grandahl agreed to do it. The paint already on the car was over-kill. One could tell by looking at the car that it had been repainted before. Coleman wanted metallic paint. Coleman was told by Grandahl that the paint on the car was no longer available, that it was not going to be possible to match the paint.
Grandahl tried several times to get a matching mix without success. The paint on the car was cracked and needed to come off. This now became a restoration. Conventional paint removal procedure did not work. Baking soda blasting was required at a cost of $1,100. Coleman was so advised and gave Grandahl $1,000. Two weeks later Coleman was told the first procedure had not worked and that another blasting was necessary. Coleman gave Grandahl $500 with the other $500 to be paid when finished.
By April 1997 85% of the work on the car had been completed. Coleman did not have enough money to continue. Coleman told Grandahl it would be a while before he got his Workers' Compensation award. Grandahl was stilled owed for all the labor hours put into the car's repair. Grandahl offered to the keep the car at his house and. did so from April 1997 to CT Page 11033 October 1997 when Coleman asked him to bring the car back to the garage. The car had to be flatbedded each way, for which Coleman was not charged. When the car was brought back, Coleman gave Grandahl $4,000.
Once the car was back Coleman gave Grandahl no indication that he wanted his car ready by a certain date. Nor did Coleman at anytime complaint about the work that was done on the car. At one point Coleman had remarked to Kozikowski that there was some unevenness in the way the hood sat on the car. Kozikowski told him once the new motor was in and the radiator placed in its permanent position, the alignment would be adjusted.
When the car got back to the garage it was sanded and buffed, doors were realigned, windows adjusted, work normally left to the end was done. Coleman was told the remaining work was $1,000. Coleman paid $500 towards that.
The car remained at J G until July 1998 when on July 9th Coleman appeared and demanded his car. Prior to that time no completion date had been communicated by Coleman to Grandahl. On that date Coleman went into the shop, looked at the car and asked why the bumper cover didn't match the hood. Grandahl replied that that was the best he could do. At that, Coleman told Grandahl to give him his car, to give him his bill, and told Grandahl that he was going to take care of him and Joe Bailey. Grandahl was scared. He got the car, gave Coleman the bill marked paid and has not talked to Coleman regarding the car since then.
If Coleman had given Grandahl a date by which he wanted his car, it would have been finished by that date. At the time Coleman picked up his car, $8,000 worth of work had been done on it. Coleman's expert who had simply been asked to give an appraisal of the work to be done on the car confirmed that the work already done on the car was worth $7,000. This was the figure originally agreed on between Grandahl and Coleman before the paint job was added.
On February 10, 1999, 6 months after Coleman took his car from J G, Coleman filed a complaint with the Dealers and Repairers Division of the Department of Motor Vehicles. In this written complaint Coleman checked off under the section dealing with complaints regarding customer paid complaints the following boxes: A1) repair did not correct the problems vehicle brought in for; A2) repair caused additional problems with vehicle; A4) additional trips to the repairer are required for the same problems; A5) repairer overcharged for repairs; A6) repairer did not provide an estimate to perform repairs to vehicle; A8) repair bill exceeded estimate provided as to the cost of repairs; A9) repairer never completed the repairs; A10) repairer charged for repairs that were never CT Page 11034 done; A13) repairs performed negligently or fraudulently.
Upon receipt of the complaint the Dealers and Repairers advised Coleman by letter dated March 1, 1999, that additional documentation of the problem was required to substantiate his allegations. Coleman was advised in this letter that he had to obtain a written statement from a Connecticut licensed dealer/repairer that clearly described the current condition of his vehicle; that this written statement had to indicate specifically how the current condition was caused by the dealer/repairer against whom he filed his complaint. Upon receipt of the March 1, 1999 letter, Coleman dropped off a copy of the Stanley Auto Body estimate, but did not provide the documentation asked for in the March 1, 1999 letter.
In the twenty-eight years that J G has been in business there has been only one complaint prior to this one of Coleman's and that one was resolved at the administrative level. Upon receiving a copy of Coleman's Dealers and Repairers complaint Grandahl called Dealers and Repairers indicating a willingness to try to resolve the matter. However, Coleman did not provide the documentation requested by Dealers and Repairers so that the complaint went no further. Instead, Coleman brought the instant action.
One month after Coleman took his car from J G he went to Stanley's Auto Body (Stanley) for an estimate of the work, both inside and outside, that needed to be done on the car. This written estimate was dated August 4, 1998. Stanley was not asked to look at the work done by J G to determine what J G had done to cause the condition of the car that Coleman was seeking to have remedied. In fact, the part owner of Stanley, Michael Wilkowski, found that the work done by J G was worth the $7,000 charged by J G for that work.
The work that Stanley found had to be done on the car was the work identified by J G that would be done after Coleman put in the new motor. The interior of the car was not to be worked on by J G. The interior had all of the electrical wires hanging down. There was no dash board cover. Seats and belts needed to be repaired. The inside had all of the appearance of an abandoned car that had been ravaged. Stanley's estimate included interior work.
We address now the causes of action put forth by the plaintiff in his four count complaint. Count one alleges breach of agreement. Coleman had his 1981 Chevrolet Camaro towed to J G following an accident which damaged the front end nose of the car. The work to be done by J G was body work only. In his memorandum of law, in support of his claim of Breach of Agreement, the plaintiff stated in his first paragraph the following: CT Page 11035
 Not only was the vehicle in an unsafe, abysmal physical and mechanical condition when Coleman retrieved it in July 1998, but it would not even pass a state emissions inspection. In short, at the time J G released the vehicle to Coleman, it was not in any condition that was of any use to Coleman, and, moreover, it was unsafe to drive on Connecticut roads.
Coleman had not entered into any agreement regarding mechanical or electrical work on the car. He wanted the hood of the car fixed. It needed to be replaced and a replacement was found with some difficulty because of the age of the car. Replacement parts themselves had to be worked on to make them. usable on the car. At a point Coleman decided he wanted the car repainted and it was agreed J G would repaint. While J 
G was working on the car Coleman picked up a replacement radiator which was bigger than the one in the car. The bigger radiator was to accommodate a larger motor which Coleman was going to put in because he was going to race the car. In the period from November 1996 through July 8, 1998 when he took the car, Coleman did nothing about getting a new motor. No effort whatsoever was put forth by Coleman to address the mechanical needs of the car during the period it was with J G.
When the car was towed to J G underneath the hood was as much of a disaster picture as the interior of the car. It looked as though it had been an abandoned car. However, taking care of the mechanical problems was not part of the agreement Coleman and J G had. On the facts found we conclude as to count one that J G fulfilled the agreement entered into with Coleman.
Count two alleges misrepresentation, the misrepresentation being that J G represented to Coleman that in consideration for payment of $3,500.00 J G would repair his vehicle to the same condition it was in prior to the November 1996 collision; that in reliance upon that representation, Coleman paid over to J G $8,000. On the facts found this court concludes that the plaintiff Coleman has not proven his claim. There was no agreement to put the vehicle in pre-accident condition for $3,500.00. There was no agreement that the car was to be able to be driven safely. There was no agreement that the car was to be made capable of passing an emissions inspection. The agreement had nothing to do with the mechanical aspects of the car. The agreement was for body work and later for a paint job.
On the facts found this court concludes that there was no misrepresentation by the defendant. CT Page 11036
Count three alleges a violation of C.G.S. § 38a-355 which provides in part that an auto repairer is required to:
 "prepare a "written estimate of . . . the cost of such repairs shall clearly identify in such estimate each major replacement part to be used which is not manufactured by the original manufacturer of the damaged part of such motor vehicle. For the purposes of this section, "parts" means motor vehicle replacement parts of sheet metal or plastic, which constitute the visible exterior of the vehicle, including inner and outer panels, and which are generally repaired or replaced as the result of a collision[;]" [C.G.S. § 38a-355(a)(1)];
 provide a written notice that "[t]his repair estimate is based in part on the use of replacement parts which are not made by the original manufacturer of the damaged parts in your motor vehicle[;]" [C.G.S. § 38a-355(a)(2)]; and
 give a copy of such estimate and notice to the customer. [C.G.S. § 38a-355(a)(3)]."
On their first meeting Grandahl made it clear that because of the age of the car he did not know if he could get parts for it and, if found, the cost involved in purchasing them and making them usable on the car. Coleman accepted this and gave Grandahl $1,500 toward the purchase of parts. Coleman knew he could ask for a written estimate as shown by his contact with Stanley Auto Body where upon taking the car there he asked for and got an estimate of the work they would do. Over the 20 months that the car was with J G with Coleman advancing money for parts as needed he did not once ask for a written receipt or an estimate of the work done and being done under their agreement. There was between them a verbal agreement as to the price which overtime Coleman met, without complaint.
The arrangement Coleman and J G had about the work to be done was not the usual customer and repairer arrangement. It was understood at the outset that time was not of the essence; that the car would be worked on as the opportunity presented itself, that is, in between insurance repair work; that because of the vintage of the car it might be difficult to get parts; that there was no way of knowing for purposes of an estimate what these parts would cost; that Coleman himself would attempt to seek out parts. It was akin to a joint understanding. During the months that the car was with J G, Coleman was almost a daily visitor. Not once was CT Page 11037 there any indication that Coleman had a problem with this arrangement.
The plaintiff's reliance on C.G.S. § 38a-355 both as to its provisions regarding a written estimate and notice as to the kind of replacement parts used is misplaced in the context of the instant case. Nor is there a basis for a per se argument which would bootstrap Coleman into a CUTPA claim. Coleman let twenty months go by without once raising any question about the time the work was taking and the quality of the work done. Pursuant to the parts and labor arrangement Coleman advanced money as needed for parts and when his Workers' Compensation claim came through paid off the $4,000 which remained to be paid.
Coleman was able to get an estimate from Stanley's Auto body because replacement parts were not a factor. With J G replacement parts were an unknown cost factor. This was explained to Coleman and he accepted the fact that no estimate could be provided because of the nature of the body work involved and the vintage of the car.
For the reasons stated the court finds for the defendant as to Count three.
Count four alleges a violation of the Connecticut Unfair Trade Practices Act § 42a-110b, et seq. (CUTPA), the claim being that the defendant's behavior was so unfair and deceptive as to violate public policies associated with the conduct of its trade. The claimed behavior was that J G continuously misrepresented the cost of the purported repairs; that J G avoided working on Coleman's vehicle in lieu of more lucrative insurance repair work; that J G ignored Coleman's pleas for completion of the repairs on his vehicle; and that J G abjectly failed to provide Coleman with a vehicle that could be safely driven on the roads of Connecticut. On the facts found this court concludes that there was no misrepresentation of the cost of repairs. The arrangement was clearly a parts and labor arrangement. At no time when money was advanced for parts did the plaintiff indicate any concern about the amounts, nor did he question the $4,000 he paid over to J G when the car was brought back from Grandahl's house where it had been kept without charge because Coleman had not yet the money from this Workman's Compensation claim to pay off the balance of the amount agreed upon, 85% of the work at that point having been done. Nor can Coleman be heard to complain about J G's doing their insurance repair work first. Grandahl was up front about that aspect of his work. Coleman was told when he brought the car in that it would be worked on as they could with their insurance repair work getting priority. Coleman made it very clear that there would be no rush about getting the car since the bulk of the money he was going to use for the car was to come from his Workman's Compensation claim which was going to take time, which in fact it did. CT Page 11038
During the twenty months that the car was at J G, Coleman did not once express concern about the amount of time the car was at J G. On July 9, 1998, Coleman appeared demanded his car, put it on a trailer and left. Even then Coleman did not complaint about the amount of time the car had been with J G.
Finally, as noted earlier, there was no agreement that J G would be doing any mechanical or electrical work on the car. At no time was there any agreement J G was going to make the car safe to drive. When Grandahl took the car to his house it was flatbedded. On its return to the garage it was also flatbedded. At this point 85% of the agreed upon work was done. This was body work and painting of the car.
This court finds that the plaintiff has failed to prove by a preponderance of the evidence Counts one, two, three and four of the complaint. Accordingly, judgment may enter in favor of the defendant as to Counts one, two, three and four.
Hennessey, J.